UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR CONEY,

     Plaintiff,

v.

CITY OF WARREN, *et al.*,

     Defendants.

Case No. 14-10842
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [25]

---

Police respond to a 911 call. The caller says that he has been the victim of a crime, identifies the perpetrator and possible motive, and there is marginal evidence corroborating the victim's accusation. Would any reasonable officer immediately arrest the accused without further investigating his side of the story? That is the key question in this case.

On March 24, 2012, Hassan Collier called 911 and reported that he had been shot at in the parking lot of the used-car dealership where he worked. When City of Warren police officers responded to Collier's call, Collier told them that Plaintiff Omar Coney had tried to shoot him because of a money dispute arising out of a used truck that Collier had sold Coney some weeks earlier. The officers found shell casings scattered in the dealership lot that partially corroborated Collier's story. Oddly though, Collier claimed that some of his coworkers witnessed the shooting, but Collier could not name them. Based on Collier's detailed description of Coney and the house where Coney lived, officers proceeded to Coney's residence and arrested him outside his home. At the time of arrest, the officers asked Coney no questions about the shooting and

Coney volunteered no information. Coney was booked and jailed for four days before posting bond.

As it turned out, Collier had told a lie—he had shot at Coney. Coney believes that had the officers not been derelict they would have figured this out before arresting him. As such, Coney has sued ten City of Warren police officers for violating his rights under the Fourth Amendment of the Constitution (as incorporated against the states via the Fourteenth). He also says they committed torts of false arrest and false imprisonment. And Coney accuses the City of Warren of failing to adequately train its officers on how to determine probable cause for an arrest.

The parties have completed discovery and Defendants now seek summary judgment. (Dkt. 25, Defs.' Mot. for Summ. J.) They contend that Coney did not uncover the evidence he needs to persuade any reasonable jury of unlawful conduct, or, if he did, that they are immune from suit. The Court has been fully advised by the record and briefs and so it will not hold a hearing. *See* E.D. Mich. LR 7.1(f)(2). For the reasons set forth below, the Court will largely grant Defendants' motion.

## I.

The parties essentially agree on what happened. As to the few disagreements, the Court accepts Coney's account, as he is the party responding to a summary-judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.

In February 2012, Coney, based on the recommendation of his friend, Anthony Allen, bought a truck from a used car dealership on Eight Mile in Detroit, Michigan, descriptively named "8 Mile Uzed Autoz." (Counter Stmt. of Material Facts ¶ 1; Coney Dep. at 27; Allen Dep. at 7.) Collier was either a manager or an owner of the dealership. (*See* Dkt. 29, Counter Stmt. of

Material Facts ¶ 1.) Coney paid around $4,700 of the $5,000 asking price for the 2002 Chevrolet Avalanche, agreeing to pay Collier the rest later. (*See* Counter Stmt. of Material Facts ¶ 1; Coney Dep. at 27; Allen Dep. at 7.) As it turned out, the truck gave Coney all sorts of problems, including "engine knocking." (Coney Dep. at 27–28.)

On March 24, 2012, Allen, who was also a friend of Collier, went to Uzed Autoz to speak with management about the issues with Coney's truck. (Allen Dep. at 6–7.) Although Collier was there, Allen was primarily speaking with "Jeff" and thought that he had secured a deal for a refund or a new vehicle. (Counter Stmt. of Material Facts ¶ 2; Allen Dep. at 8.) So Allen texted Coney to come to the dealership. (Counter Stmt. of Material Facts ¶ 2; Allen Dep. at 8–10.)

Coney, Toni Smith, and their child arrived at the dealership less than 20 minutes later. (*See* Allen Dep. at 9; Smith Dep. at 7–8, 13–14.) Allen recalled,

> [W]hen [Coney texted me] I'm pulling up[,] . . . then I said, okay, Omar outside. . . . When I said that to Jeff, he said man, you shouldn't have . . . he up here? I said yeah. [Jeff] said man, he shouldn't have came, you shouldn't have told him to come up here. Simultaneously Sean zipped out the door, and the best I always describe it—because it took me a second to realize actually what was happening—but I heard a sound (witness snapping fingers), a click, you know.

(Allen Dep. at 11.)

"Sean" (short for Hassan) Collier had shot at Coney. (Allen Dep. at 9, 13–14; Coney Dep. at 31.) Coney avoided the gunfire by "ducking between cars." (Allen Dep. at 16; Coney Dep. at 31.) Ms. Smith, meanwhile, drove "down Eight Mile and did like a Michigan-U." (Coney Dep. at 35.) Coney recalled, "And [Collier] was still shooting. Once he got done, I ran across the street and jumped in the car with them." (*Id.*)

Coney, Smith, and their child then drove to Smith's home. During the approximately 20-minute drive, Coney attempted to call 911 but the call dropped. (Coney Dep. at 40.)

3

Coney then drove to where he was living at the time: his girlfriend Audra Dozier's house. (Counter Stmt. of Material Facts ¶ 7; Coney Dep. at 22, 42; Smith Dep. at 30.) Coney arrived at Dozier's around 2:30 p.m. (Counter Stmt. of Material Facts ¶ 7.)

**B.**

Sometime after the shooting, Collier, from a McDonald's about a mile from the dealership, called 911 to claim that *Coney* had shot at *him*. (*See* Dkt. 29, Pl.'s Resp. Ex. 8, Reed Rep. at Pg ID 617.) Around 5:00 p.m., City of Warren Police Officers Mirek Skomski and William Reed were dispatched to the McDonald's. (Reed Rep. at Pg ID 617–18; Reed Dep. at 16.) While en route, dispatch advised the officers that Collier "wanted to file a report regarding a subject who fired several gun shots at him in the vicinity of 8 Mile/Groesbeck." (Reed Rep. at Pg ID 617.)

Once the officers arrived, Collier told them that "Omar" had bought a Chevy Avalanche from him and had been contacting him "for the past two weeks saying that something is wrong with the engine . . . and that he wanted his money back." (Reed Rep. at Pg ID 618; *see also* Counter Stmt. of Material Facts ¶¶ 16–19.) Collier reported that when Coney arrived at the dealership, he got out of his car, shouted "Give me my money!," and began shooting. (Reed Rep. at Pg ID 618.) Collier told Reed and Skomski that he tried to drive to the police department, but, after he could not find it, he pulled into the McDonald's to call 911. (Counter Stmt. of Material Facts ¶ 18.) Collier was also able to describe Coney in some detail: "light skinned [black male], standing approximately 6'1-6'2[,] weighing 235 pounds[,] . . . wearing a striped button up shirt . . . and blue jeans." (*Id.*) Skomski asked Collier to take him and Reed to the scene. (*Id.*)

Once at Uzed Autoz, the two officers "observed nine . . . gold 9mm casings and one . . . silver 9mm casing spread throughout the parking lot." (Reed Rep. at Pg ID 618.) According to

4

Reed, "[Collier] stated that there were several witnesses [to the shooting]. At the time that we responded to the used auto dealership, businesses were closed for the day and there was nobody there. [Collier] stated that he had several witnesses, and he could provide us with their contact information at a later date." (Reed Dep. at 18; *see also* Skomski Dep. at 13 ("We did our walk through, and we did not find any witnesses whatsoever.").) Skomski testified that Collier could not provide the co-workers' names. (Skomski Dep. at 14.) Collier told the officers that "he was unable to complete a written witness statement . . . because he was too shaken up from the incident." (Reed Rep. at Pg ID 619.) Collier further provided Skomski and Reed with the cross streets where Coney lived, and described the premises. (Reed Rep. at Pg ID 618.)

Skomski and Reed proceeded based on Collier's description. As they approached Dozier's house, they noticed a Chevrolet Avalanche parked in the driveway. (Reed Rep. at Pg ID 619.) Reed "requested dispatch to run the plate and they advised that . . . [the] vehicle was registered to Omar Alexander-Roman Coney in Detroit." (*Id.*) Around this time several other police units were arriving at Coney's residence. (*Id.*) It appears that at least Defendants Thomas Petruzzini, Timothy Pasternacki, Shane McKibben, David Huffman, and Michelle Siegfried (along with Skomski and Reed) eventually arrived on scene. Skomski would later testify that the number of responding officers was not unusual because they were dealing with "[a]n armed suspect." (Skomski Dep. at 16.)

As Reed and Petruzzini approached Dozier's front door, other officers secured the area. (*See* Reed Rep. at Pg ID 619.) When Dozier answered, Reed asked her "to exit the residence [and] she did as requested." (*Id.*) Dozier then confirmed to Petruzzini and Reed "that Omar was inside of the house." (*Id.*) Dozier was "secured" and put "out of harm[']s way." (*Id.*)

5

Reed then "announced [the officers'] presence and advised [Coney] to exit the residence with his hands in the air." (Reed Rep. at Pg ID 619.) Coney complied and was arrested. (Coney Dep. at 46–47.) Reed testified that, after "consulting" with Sergeant Petruzzini, it was his and Skomski's decision to arrest Coney. (Reed Dep. at 29.) Reed "took custody of Omar and retreated to the driveway where [the two] took cover behind the red/grey Chevrolet Avalanche." (Reed Rep. at Pg ID 619.) Reed searched Coney, "remov[ing] a black LG cell phone [from] his right rear pants pocket." (*Id.*) Coney told the officers that there were two others still inside: Allen (who had left Uzed Autoz after the shooting and gone over to Dozier's) and William Wheeler, Collier's mechanic. (Counter Stmt. of Material Facts ¶¶ 8, 31.)

Skomski then called for Allen and Wheeler to exit the home and they complied. (Reed Rep. at Pg ID 619; Coney Dep. at 45.) Although the two were arrested, after Reed verified that neither had outstanding warrants, they were released. (Reed Dep. at 35; Reed Rep. at Pg ID 620.)

Allen testified that while he was out in front of Dozier's house, he overheard the officers searching Coney's cell phone:

> [The officers] were mentioning about texts. They said that—I don't want to say— they were going through the text messages. . . . [T]here was an officer saying Sarge, got his phone, this is the messages. They was talking like there was already something figured out or whatever. I don't know. I don't want to speak too deep into it. But it became apparent that they were in his phone reading messages.

(Allen Dep. at 21–22.) Among the text messages on Coney's phone was an exchange between Coney and Ahamanda Mahan, the mother of one of Coney's children, wherein Coney writes, "They just tried to shoot me," and Mahan responds, "Ommfg. Are u ok damn I told u to sue they ass." (Pl.'s Resp. Ex. 11, Screen Shots from Coney and Mahan's Cell Phones.)

After Dozier, Coney, Allen, and Wheeler had exited Dozier's home, officers Skomski, Pasternacki, McKibben, Huffman, and Siegfried went inside. (Counter Stmt. of Material Facts

¶ 34; *see also* Skomski Dep. at 16.) Skomski testified that they went in to perform a "[q]uick protective sweep of the home" and that they did not look for weapons but only people. (Skomski Dep. at 20.)

Reed and Skomski then brought Coney to the City of Warren jail for booking. (Reed Dep. a 28.) During the booking, Coney "spontaneously stated" to Skomski and Reed that he did not shoot at Collier. (Reed Rep. at Pg ID 620.) Reed's police report provides the details: "Omar stated that he arrived at Collier's work with his child's mother to speak with him concerning the red/grey Avalanche. He said that Collier exited the office, raised a silver pistol and fired 9-10 shots at him." (Reed Rep. at Pg ID 620.) Either Reed or Skomski (Reed could not remember who) asked Coney why he had not called the police; Coney explained that he had wanted to handle the situation himself. (Reed Dep. at 30.)

Following booking, City of Warren detective Bozek (his first name does not appear in the record), completed a field test by swabbing Coney's right hand. (Bozek's Rep. at Pg ID 622.) Bozek wrote in his report: "The swab showed dark spots or specks. According to the kit instructions these specks indicate the presence of nitrates and strong probability that a weapon was fired recently." (*Id.*) Reed recalled Bozek stating that there were "positive results on the test." (Reed Dep. at 37.)

## C.

The day after Coney's arrest, March 25, 2012, Melvin Nearing, a detective in the City of Warren's Criminal Investigation Unit, began investigating the shooting at Uzed Autoz. (*See* Nearing Rep. at Pg ID 623; Nearing Dep. at 53.) Nearing started by reading Reed's police report; Nearing noted: "Coney denied shooting at Collier, and stated that he was actually the one who

was shot at. He stated Collier shot at him." (Nearing Rep. at Pg ID 623; *see also* Nearing Dep. at 53.)

Nearing then went to collect DNA from Coney. "During the process Coney was adamant that he was falsely accused, and that Collier was the person who shot at him." (Nearing Rep. at Pg ID 623.) Coney explained his version of the events to Nearing, including that when he exited the car, Collier fired ten shots. (*Id.* at Pg ID 624.) Nearing wrote in his investigation report, "[Coney] stated he knew he should have called [the] police, but he wanted it all to be over." (*Id.*) Coney identified Smith and Allen as witnesses who "knew Collier was the shooter." (*Id.*)

The next day, March 26, 2012, Nearing appeared before Michigan 37th District Court Judge Jennifer Faunce to swear to a criminal complaint charging Coney with one count of assault with intent to murder. (*See* Counter Stmt. of Material Facts ¶ 45.) Nearing's report provides that, during the arraignment, he told Judge Faunce about "the possibility of a false report" and that "it could not be verified . . . who the actual shooter was." (Nearing Rep. at Pg ID 624.) Judge Faunce issued a warrant for Coney's arrest. (*Id.*)

The same day, Mahan—who had received the "They just tried to shoot me" text from Coney—called Nearing and told him that she had witnessed the shooting. (Nearing Rep. at Pg ID 607.) To test Mahan's veracity, Nearing asked Mahan if she had witnessed the shooting from the gas station directly across from Uzed Autoz; although Mahan said she had, there was no such station. (*Id.*) Upon further questioning in person, Mahan "knew she was caught in a lie, and admitted that she [had] not witness[ed] the shooting." (*Id.*) She did, however, show Nearing the text. (*Id.*)

Nearing also interviewed Smith and Allen on March 26—both said it was Collier, not Coney, who was the shooter. Smith told Nearing that "she watched as Omar went toward the

business at which time Collier came out and started shooting at Omar." (Nearing Rep. at Pg ID 625.) And Allen stated that "he ran outside [of the Uzed Autoz office] and saw Collier holding a silver semi auto handgun in his right hand cocked sideways firing at Coney." (*Id.*) Allen told Nearing that he was "friend[]s with both subjects, and had no reason to accuse one or the other, and was telling the truth." (*Id.*) Following his interviews with Smith and Allen, Nearing "felt that [Collier], in fact, was the suspect." (Nearing Dep. at 43.) Still, Nearing "wanted to interview [Collier], interrogate him to see how he answered to being accused of being the actual shooter." (*Id.*)

So Nearing interviewed Collier the next day, March 27, 2012. When Nearing confronted Collier with the eyewitness statements, Collier "had no . . . valid answer to being accused of being the shooter." (Nearing Rep. at Pg ID 625–26.) As Nearing continued to point out evidence implicating Collier, Collier asked to speak with a lawyer. (*Id.* at Pg ID 626.)

Coney posted bond on March 27, 2012—four days following his arrest. (*See* Compl. ¶¶ 51–53, 55.)

At his deposition, Nearing recalled talking about "what to do" with his "supervisors and the prosecutor . . . probably by [March 28, 2012]," but Nearing's investigation report indicates that it was not until April 3, 2012 that he "presented the facts and circumstances of this incident" to the prosecutor's office. (Nearing Rep. at Pg ID 626.) Nearing also testified that he requested that the prosecutor dismiss the charges against Coney, but could not remember when he made this request. (Nearing Dep. at 50.) Although informed of the evidence supporting Coney's innocence, the prosecutor's office still wanted Coney to take a polygraph test before dismissing the charges. (Nearing Rep. at Pg ID 626.)

On April 5, 2012, Michigan 37th District Court Judge Matthew Sabaugh dismissed the charges against Coney. (Nearing Rep. at Pg ID 626.)

Collier was eventually arrested and pled guilty to charges arising out of the shooting at 8 Mile Uzed Autoz. (Reed Rep. at Pg ID 627; Coney Dep. at 50.)

### D.

A little less than two years later, Coney filed this lawsuit against the City of Warren and ten of the City's police officers: Skomski, Reed, Nearing, Petruzzini, Pasternacki, McKibben, Huffman, Siegfried, Nathan Callow, and Daniel Novak.

Coney's Complaint sets forth three counts. Count I is a compound claim: Coney alleges that "Defendants" (he does not specify which) violated his Fourth (and Fourteenth) Amendment rights to be free from unreasonable searches and seizures by (1) "arresting him without a warrant," (2) "searching his home and his person," and (3) "detaining him for four days without probable cause." (Dkt. 1, Compl. ¶ 55.) In Count II, Coney asserts that the City of Warren is liable because "Defendants' unconstitutional actions were undertaken pursuant to a policy, custom, or practice of Defendant City of Warren of conducting unreasonable searches and seizures in violation of the Fourth Amendment." (Compl. ¶ 59.) And in Count III, Coney says that "Defendants" (again Coney does not say which) violated Michigan law by arresting and detaining him without probable cause. (Compl. ¶¶ 62–64.)

Defendants seek summary judgment on all counts. (Dkt. 25, Defs.' Mot. for Summ. J.)

### II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

10

### III.

### A.

Before addressing the merits of Coney's claims, it helps to sort out which "Defendants" are even plausibly liable for which alleged wrongs.

Regarding Coney's arrest, the undisputed facts indicate that it was Reed and Skomski's decision to arrest Coney and that it was only Reed and Skomski who brought Coney to the police station and booked him. (Reed Dep. at 28–29; Skomski Dep. at 21–22; Reed Rep. at Pg ID 619.) So the other eight officer-defendants in this case are entitled to summary judgment on Coney's claims of unconstitutional arrest (Count I) and false arrest under Michigan law (Count III). *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (providing that "[i]n a § 1983 suit" "[a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct").

Regarding the protective sweep of Dozier's house, the undisputed facts indicate that it was only Skomski, Pasternacki, McKibben, Huffman, and Siegfried who went inside. (Counter Stmt. of Material Facts ¶ 34; *see also* Skomski Dep. at 16.) So the other five officer-defendants are entitled to judgment on Coney's claim of an unconstitutional search (Count I).

As for the search of Coney's cell phone, Reed was the officer who obtained it, but the record does not say which officers searched it. As will become apparent below, any officer that searched it is entitled to qualified immunity, so the Court will assume in Coney's favor that all the Defendants searched his phone.

Regarding Coney's four-day detainment, Nearing was the detective assigned to investigate the shooting and who sought a warrant for Coney's arrest. (*See* Reed Dep. at 13, 30; Skomski Dep. at 27; Nearing Rep. at Pg ID 622–23.) And it was Nearing who was responsible for communicating with the prosecutor. (Counter Stmt. of Material Facts ¶ 52; Nearing Rep. at

Pg ID 623, 626.) So the other nine officer-defendants are entitled to judgment on Coney's claims of unconstitutional detention (Count I) and false imprisonment under Michigan law (Count III).

It follows from all of this that Thomas Petruzzini, Nathan Callow, and Daniel Novak are entitled to summary judgment on all claims.

### B.

In Count I, Coney claims that Defendants violated his Fourth Amendment right to be free from "unreasonable searches and seizures" by arresting him and detaining him without probable cause. Reed, Skomski, Nearing, Pasternacki, McKibben, Huffman, and Siegfried assert that they are entitled to qualified immunity. (*See* Defs.' Mot. for Summ. J. at 9, 16, 19.)

### 1.

Qualified immunity shields a government official from the burden of a lawsuit seeking money for injuries caused by the official's reasonable, discretionary actions. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Once an officer adequately raises the qualified immunity defense, it becomes the plaintiff's burden to defeat it. *Webb v. United States*, — F.3d —, No. 14-3443, 2015 WL 3756919, at *8 (6th Cir. June 17, 2015). On summary judgment, a § 1983 plaintiff must show that, (1) when the evidence is viewed in the light most favorable to him, the state officer violated a constitutional right, and (2) the right that the officer violated was clearly established when the officer acted. *See Webb*, 2015 WL 3756919, at *8.

Regarding prong one, Coney stresses that whether the City of Warren police officers had the requisite probable cause to arrest and detain him "presents a jury question." (Dkt. 29, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 16 (emphasis removed).) But under prong two of the qualified-immunity test, the officers are not liable so long as their belief that there was probable cause to arrest and detain Coney was reasonable in light of the law that was clearly established at

the time of Coney's arrest. *Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987))); *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) ("[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent."). And—critically—whether a reasonable officer could believe there was probable cause to arrest and detain Coney is not a jury question but one of law for the court to answer. *Hunter*, 502 U.S. at 227–28 (holding that lower court's statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact," was "wrong" as it "routinely places the question of immunity in the hands of the jury"); *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015) ("On the second [qualified-immunity] prong, *a court* must determine whether there was clearly established law at a sufficient level of specificity to put a reasonable officer on notice that the conduct at issue was unconstitutional." (emphasis added)); *Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) ("The reasonableness of an officer's probable cause determination is a question of law.").

The Court acknowledges that the standard set out in Coney's primary authority, *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), is to the contrary. (*See* Pl.'s Resp. at 16–18.) In particular, the *Gardenhire* court said, "viewing the facts in a light most favorable to the Gardenhires, we must determine whether *a jury* could conclude that a reasonable officer could have believed that the couple had probably committed or were committing a crime." 205 F.3d at 315 (emphasis added). The Court believes that this statement, insofar as it places the could-have-believed question in the hands of a jury, stems from the appellate court's reliance on *Pyles v.*

13

*Raisor*, 60 F.3d 1211 (6th Cir. 1995). *See Gardenhire*, 205 F.3d at 315 (quoting *Pyles*). But *Pyles* explicitly declined to address qualified immunity. 60 F.3d at 1215 n.1. Moreover, *Gardenhire*'s standard is directly contrary to prior, published Sixth Circuit precedent, *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993), and prior Supreme Court precedent, *Hunter*, 502 U.S. at 227–28. So the Court declines to use *Gardenhire*'s rule that a jury decides the could-have-believed question. *See First Am. Title Co. v. Devaugh*, 480 F.3d 438, 457 (6th Cir. 2007) ("[T]o the extent that a Sixth Circuit decision allegedly conflicts with a Supreme Court decision, the district court is obligated to follow the Supreme Court decision"); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("We cannot overturn the prior published decision of another panel and are therefore bound by these previous decisions.").

## 2.

With the qualified-immunity standard settled, the Court turns to the task of applying that doctrine to Coney's arrest. The Court declines to address prong one. *See Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011) ("[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."). Although the Court is inclined to find that a reasonable jury could find that Reed and Skomski lacked probable cause to arrest Coney, Coney has not shown that the law in existence at the time of his arrest made clear to every reasonable officer in Reed and Skomski's position that probable cause was lacking. *See Webb*, 2015 WL 3756919, at *8 (providing that a plaintiff must "demonstrate that the government official violated a right that was so clearly established 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" (quoting *al-Kidd*, 131 S. Ct. at 2083)).

"The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012). On the one hand, "it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). Thus, Coney need not direct the Court to a case "directly on point." *al-Kidd*, 131 S. Ct. at 2083; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). On the other hand, the Supreme Court has recently and "repeatedly told [the lower] courts . . . not to define clearly established law at a high level of generality." *City & Cnty. of San Francisco, Calif. v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1775–76 (2015); *see also Rudlaff v. Gillispie*, — F.3d —, No. 14-1712, 2015 WL 3981335, at *6, 9 (6th Cir. July 1, 2015) (Donald, J., dissenting) (acknowledging "the Supreme Court's recent heightening of the second prong of the qualified-immunity standard"); Karen Blum, Erwin Chemerinsky, & Martin A. Schwartz, *Qualified Immunity Developments: Not Much Hope Left for Plaintiffs*, 29 Touro L.Rev. 633, 654 (2013). Indeed, "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cnty. of San Francisco, Calif. v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1775–76 (2015); *see also Hagans*, 695 F.3d at 508 ("If a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry always to answer the clearly established inquiry."). So the aim is to find "an appropriate middle ground," *Hagans*, 695 F.3d at 508, mindful that the law must make it apparent to reasonable officers that their conduct was unlawful.

Coney believes that *Dietrich v. Burrows*, 167 F.3d 1007 (6th Cir. 1999), strikes the balance: "'probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'" (Pl.'s Resp. at 22–23 (quoting *Dietrich*, 167 F.3d at 1012).) Coney argues that this law, "clearly established since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 (1925)," *Dietrich*, 167 F.3d at 1012, gave City of Warren officers fair warning that his arrest was unconstitutional because of the following exculpatory evidence: (1) Collier's credibility was questionable given that he could not name his coworkers who he claimed saw the shooting, (2) Reed and Skomski failed to inform Coney of the charges against him or question the individuals arrested at Dozier's house, including Coney (who had been accused of the crime) and Allen (who had witnessed it), and (3) that his cell phone contained records of a call to 911 and a text message saying, "They just tryed to shoot me." (Pl.'s Resp. at 23; *see also* Pl.'s Resp. at 17–18.)

But the clearly-established law articulated in *Dietrich* provided little guidance to Reed and Skomski. At the time of Coney's arrest, Reed and Skomski did not know that Allen had been a witness to the shooting. Although the officers did not inform Coney of the reason he was being arrested, Coney testified that he surmised the reason (*see* Coney Dep. at 45) yet he volunteered no information. As for the search of Coney's cell phone, the record conclusively shows that any such search occurred after his arrest. So, as to these two facts unknown to Reed and Skomski, another clearly-established point of law is a better fit: "[A]fter the officer determines, on the basis of the facts and circumstances *known to him*, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence," *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (emphasis added).

As for Reed and Skomski's failure to discount Collier's credibility because Collier could not identify his own coworkers (who he claimed had seen the shooting), that fact is much different from the one negating probable cause in *Dietrich*. There, Kenneth Dietrich, a former police chief of Perkins Township, Ohio, planned to offer armed courier services to businesses in the area. *Dietrich*, 167 F.3d at 1009. As Dietrich was aware that the Perkins Township police department was providing a similar service, he contacted the current police chief, Richard Burrows, to inform him of his plan. *Id.* Dietrich also contacted a township trustee about the police department's courier service which eventually led the local prosecutor to determine that "the township's general liability insurance policy would most likely not cover township employees engaged in 'side jobs.'" *Id.* Further, local newspapers began questioning the police department's practice. *Id.* Under pressure, Burrows issued an order prohibiting the department's practice of using police vehicles for personal services. *See id.* Not long thereafter, a Perkins Township police officer informed Burrows that Dietrich's company had been making runs for a bank. *Id.* The police decided to trail Dietrich (who was accompanied by his son) on one of their runs, and when the Dietrichs pulled over, Perkins Township officers, including Burrows, arrested the two for carrying firearms. *Id.* But Ohio permitted its citizens to carry a firearm while traveling to and from their place of business, if the business was of "such character . . . to render the actor particularly susceptible to criminal attack, such as would justify a prudent person in going armed." *Id.* at 1011. The Court of Appeals found that the arresting officers "had full knowledge of facts and circumstances that conclusively established, at the time of the Dietrichs' arrests, that the plaintiffs were justified—by statute—in carrying concealed weapons during their work." *Id.* at 1012; *see also id.* at 1011 ("[A]ll the defendants in this matter knew, prior to

arresting the Dietrichs, that the plaintiffs were legitimately armed for the purpose of conducting a business that was particularly susceptible to criminal attack.").

In contrast to *Dietrich*, the inference that Coney relies on—that Collier's report was questionable because he could not identify witnesses he presumably knew—far from "conclusively established" the lack of probable cause for Coney's arrest. In fact, many other facts supported Collier's credibility: (1) he provided the officers with a motive for Coney to shoot (that the two were having a money dispute regarding the sale of the Avalanche) and explained that when Coney arrived at the dealership Coney shouted, "Give me my money!" (Reed Rep. at Pg ID 618; Counter Stmt. of Material Facts ¶¶ 16–19), (2) the officers observed that Collier was shaken up when he recounted the shooting (Reed Rep. at Pg ID 619; Skomski Dep. at 15 ("He was shaken up. His story seemed legit.")), (3) the officers found numerous shell casings in the parking lot which corroborated Collier's claim that there was a shooting (Reed Rep. at Pg ID 618), (4) Collier was able to describe his shooter in detail (*Id.* at 618), (5) when the officers arrived at Dozier's house, they saw the Avalanche that Collier said was the subject of controversy and verified that it was registered to Coney (*Id.* at Pg ID 619), and (6) at the time the officers were at the dealership, the dealership was closed, so no coworkers were even available for questioning (*Id.* at 18; *see also* Skomski Dep. at 14–15). Thus, the general rule that "probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest," *Dietrich*, 167 F.3d at 1012 (emphasis removed), did not give Reed and Skomski fair warning that it was unlawful to arrest Coney. In contrast, that rule did give fair warning to the Perkins Township officers in *Dietrich* because the officers ignored known facts that "conclusively established" a lack of probable cause.

Nor did Coney's primary case, *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), make apparent to every reasonable officer in Reed and Skomski's position that probable cause for Coney's arrest was lacking. In *Gardenhire*, owners of two adjacent stores decided to trade store fronts: the Gardenhires' retail clothing store would move to where Mary Della Sala's thrift store was located and vice-versa. 205 F.3d at 308. As the store owners began swapping the location of their goods, Della Sala phoned the police to inform them that some of her wares had been stolen. *Id.* When police chief Donald Schubert arrived on scene, an earlier responding officer, Bill Davis, "told him that Ms. Della Sala had reported certain items missing from her store, and that some of these items were visible, through the windows, inside [the Gardenhires' store]." *Id.* Schubert then went to the Gardenhires' home and asked them to come to the police station for an interview; there, "the couple admitted that they had, at their home, the flamingo dish Ms. Della Sala reported stolen. They also told the police that they had a key to the Della Sala store." *Id.* at 309. The couple then returned home, obtained the dish, and then met the officers at the store. *Id.* When the officers discovered all the goods that Della Sala claimed were stolen in the Gardenhires' store, they thought their placement was "oddly conspicuous." *Id.* Davis thought that it would have been "foolish" for "someone to steal merchandise and then display it in the next-door window in plain view." *Id.* As the police were recovering Della Sala's items, "Ms. Gardenhire noticed that several pieces of merchandise from" her store were missing, including the cash register. *Id.* When the Gardenhires tried to tell Schubert that *they* had been robbed, Schubert "refused to deal with their complaint" and told Ms. Gardenhire to "shut up" and go wait in her car. *Id.* Schubert also informed the Gardenhires that "they would be booked on charges of theft, burglary and criminal trespass" and all but compelled them to appear before a magistrate judge for a probable cause determination. *See id.* The Court reasoned that at the time

19

of the Gardenhires' arrest, Schubert knew only "that Mary Della Sala claimed that several items from her store were missing, and that these items were visible in the store-front windows of the adjacent store." The Court concluded that "Della Sala's mere allegation that she owned the items in Ms. Gardenhire's store-front was not enough to justify an arrest." *Id.* at 317.

True, some aspects of *Gardenhire* would have given pause to reasonable officers confronting the circumstances that Reed and Skomski faced: a putative victim (Della Sala) accused individuals (the Gardenhires) of committing a crime (theft) and there was some tangible evidence of the crime (the stolen items found in the Gardenhires' store and the flamingo dish at their home), yet this was not enough to establish probable cause.

But a reasonable officer reading *Gardenhire* more completely would think that the opinion provided little guidance to Reed and Skomski. First and foremost, *Gardenhire* did not clearly establish the right at issue in this case because, as discussed, it merely concluded that a *jury could* find a lack of probable cause or that a *jury could* find that no reasonable officer would have thought there was probable cause. *See* 205 F.3d at 317, 318 ("We believe a reasonable jury could find that the police officers did not have probable cause to arrest the Gardenhires . . . ."; "With such fluid, fact-specific elements at the heart of this probable cause inquiry, it is a question properly reserved to the fact-finding province of a jury"). The Court never outright held that Shubert lacked probable cause to arrest the Gardenhires. *See id.* at 315 ("[T]here was substantial inculpatory evidence against the Gardenhires[.]").

Moreover, material facts of *Gardenhire* were different than those within Reed and Skomski knowledge. A significant part of the tangible evidence that might have corroborated Della Sala's story—that her items were in the Gardenhires' store—actually undermined her assertions. As the Court of Appeals explained,

> It is unlikely that one store owner would steal goods from another and then leave those goods in the window of her own store-front. In fact, based on where the goods were found, two of the initial investigating officials believed that the Gardenhires had been set up . . . . Even Chief Schubert admits now that the placement of the items suggests that the Gardenhires had not committed a theft.

*Gardenhire*, 205 F.3d at 315. In contrast, the shell casings found in the dealership parking lot tended to corroborate, and certainly did nothing to undermine, Collier's story. Further, as discussed, even if Collier's inability to identify his coworkers tainted his credibility, numerous other facts supported it. Save for the Gardenhires' possession of the flamingo dish, the same cannot be said about Della Sala's credibility. Further still, the Gardenhires tried to tell Schubert that they had been robbed (with Shubert telling the Gardenhires to "shut up"). Neither Coney nor Allen ever made a similar plea to Reed and Skomski. Finally, *Gardenhire* did not involve a violent crime but a theft of some thrift-store items; officers might quite reasonably ask less questions prior to arrest in the former situation than in the latter.

In all then, *Gardenhire* falls short of clearly establishing that it was unlawful to arrest Coney based on Collier's report of a violent felony and the evidence, albeit marginal, corroborating his report.

And the Court's research did not uncover any pre-March 2012 precedent that "placed the . . . constitutional question beyond debate." *See al–Kidd*, 131 S.Ct. at 2083. True, *Gardenhire* and at least one other Sixth Circuit Court of Appeals' decision suggest that an uncorroborated report by a putative victim does not suffice to establish probable cause. *See Gardenhire*, 205 F.3d at 317 ("Consider the following situation: a woman flags down a police officer and points out a Porsche being driven by a young man, which the woman claims is her car and which has been stolen by the man. Would the officer have probable cause to arrest the Porsche's driver at that point? We think not."); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir.

2005) ("[A] mere allegation [of criminal conduct], while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed."). But our Court of Appeals has also provided, "An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *accord United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006); *see also*, *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (noting "tension" between *Gardenhire*, *Radvansky*, *Ahlers*, and *Harness*). As explained, there was no "apparent reason" for Reed and Skomski to doubt Collier's story—many more facts made his account believable than suspect.

In sum, Coney has failed to carry his burden of establishing that Reed and Skomski were "plainly incompetent" or "knowingly violate[d] the law" when they arrested Coney. *See al-Kidd*, 131 S.Ct. at 2085. So they are entitled to qualified immunity for damages resulting from Coney's arrest.

### 3.

The Court turns next to Coney's claim, still under Count I, that "Defendants"—more properly detective Nearing—violated his Fourth Amendment rights by detaining him without probable cause. Nearing says he is qualifiedly immune. The Court agrees. A review of his three-day investigation reveals why.

Nearing began his investigation by reading Reed's report. (*See* Nearing Dep. at 35–36.) That report was mixed: it included Collier's claim that Coney shot at him but also included Coney's claim that Collier "fired 9-10 shots at him." (Reed Rep. at Pg ID 620.) Although an argument might be made that the conflicting accounts negated probable cause, Coney has cited no law clearly establishing that where an individual has been arrested based on the accusation of a putative victim, but the accused subsequently denies the accusation, there is a lack of probable cause to continue detention. *Cf. Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman . . . is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."). There were two plausible accounts of what had happened at Uzed Autoz and the probable cause standard did not demand that Nearing be more sure of Collier's than Coney's. *See United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008) ("[A] probable cause finding does not require a preponderance of the evidence"); *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) ("Probable cause . . . does not require . . . evidence demonstrating that it is more likely than not that the suspect committed a crime.").

Nearing next went to obtain DNA from Coney. Although Coney then told Nearing that Collier was the shooter and identified Allen and Smith as witnesses who would corroborate his account, this did not substantially change the probable-cause calculus as Nearing already knew from Reed's report that Coney claimed that Collier shot at him.

The next day, Nearing interviewed Allen and Smith who both said that Collier shot at Coney. At this point, undoubtedly some, perhaps most, reasonable officers would have concluded that Collier's account was likely false and Coney's true. Indeed, Nearing himself

testified: "At that point I felt that [Collier], in fact, was the suspect." (Nearing Dep. at 43.) But, again, Coney has not shown that the law clearly established that when a suspect's exculpatory story is corroborated by two other witnesses (especially witnesses who have a relationship with the suspect), there is no longer probable cause to detain the suspect based on the account of a putative victim. *See Webb*, 2015 WL 3756919, at *8 (providing that plaintiff has the burden of showing that "the government official violated a right that was so clearly established 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" (quoting *al-Kidd*, 131 S. Ct. at 2083)). While it is a close question, the Court thinks that at least some reasonable officers would have taken the cautious approach that Nearing did: "I wanted to interview [Collier], interrogate him to see how he answered to being accused of being the actual shooter. So I brought him in for an interview," (Nearing Dep. at 43). This is especially so given that the very day Nearing interviewed Allen and Smith, Mahan, who Coney had texted about the shooting, falsely told Nearing that she had witnessed the shooting. (Counter Stmt. of Material Facts ¶ 47.)

Nearing interviewed Collier the next day. Collier essentially had no rebuttal to Coney, Allen, and Smith's claims that he was the shooter. At this point, no reasonable officer could have thought there was probable cause to detain Coney.

But this does not mean that Nearing is liable. Although the Court is dismayed that, at least when the record is read in the light most favorable to Coney, Nearing may not have done everything possible to hasten Coney's release, as it turned out, Coney posted bond the very day that Nearing interviewed Collier. (*Compare* Nearing Rep. at Pg ID 615, *with* Coney Dep. at 21–22.) And Coney has not directed the Court to any evidence indicating that, despite his release from prison, he was damaged by Nearing's delay in bringing the issue to the prosecutor's

24

attention. Nor has Coney established that Nearing's delay was the proximate cause of his harm, *see Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 610 (6th Cir. 2007), which the Court cannot simply assume given that the prosecutor's office refused to release Coney even after Nearing informed them of all the exculpating evidence, (*see* Counter Stmt. of Material Facts ¶ 52; Nearing Dep. at 61; Nearing Rep. at Pg ID 626).

In sum, Coney has not shown that all reasonable officers in Nearing's position would have found a lack of probable cause to detain Coney between the time that Nearing started his investigation, March 25, 2012, and the time that Coney was released from prison, March 27, 2012. As such, Nearing is entitled to summary judgment on Count I.

### 4.

Skomski, Pasternacki, McKibben, Huffman, and Siegfried are not, however, entitled to qualified immunity for entering Coney's residence following Coney's arrest.

It is well settled that, with limited exceptions, officers require a warrant to search a home. *Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 856 (6th Cir. 2012) ("The right to be free from a warrantless in-home search is clearly established by the Fourth Amendment and Supreme Court case law interpreting it."). Skomski, Pasternacki, McKibben, Huffman, and Siegfried say that the exception carved out in *Maryland v. Buie*, 494 U.S. 325 (1990), applies here. (Defs.' Mot. at 17.) The Court disagrees.

In *Buie*, the Supreme Court held that officers could engage in a "protective sweep"—"a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others"—where the "searching officer possessed a reasonable belief based *on specific and articulable facts* which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a

25

danger to the officer or others." 494 U.S. at 327 (emphasis added) (internal quotation marks, citations, and alterations omitted).

Here, the record contains no "specific and articulable" facts which would have led a reasonable officer to believe that Coney's dwelling harbored someone dangerous. Indeed, as far as the Court can tell, the only record evidence pertaining to Skomski, Pasternacki, McKibben, Huffman, and Siegfried's entry into Coney's residence is this testimony from Skomski:

> Q. What happened after [Allen and Wheeler exited the house and you checked them for weapons]?
>
> A. Several officers, with myself, did a quick check of the residence to make sure no one was inside.
>
> Q. Did you look for a weapon at all?
>
> A. No. . . .
>
> Q. Were you just looking for people inside the house?
>
> A. Yes. Quick protective sweep of the home.

(Skomski Dep. at 20; *see also* Reed Rep. at Pg ID 620; Counter Stmt. of Material Facts ¶ 34.) While this testimony reveals the officers' purpose for entering the house, and what they did inside, it says nothing about what led the officers to believe that there was someone dangerous inside. But such an explanation is critical given that Collier accused only one person of shooting at him and that person had already been secured.

In their brief, Defendants offer this unsupported assertion: "Given the severity of the situation and the violent nature of the crime which the officers were responding to, there can be no serious contention that the limited sweep of the home was reasonable so as to eliminate the risk of additional persons being present and who could present a risk of harm to the officers." (Defs.' Mot. at 17–18.) But the "violent nature of the crime" has no bearing on whether someone

inside the home might be dangerous when the only person accused of the crime is already in custody. *See United States v. Archibald*, 589 F.3d 289, 299 (6th Cir. 2009) ("[A] defendant's own dangerousness is not relevant in determining whether the arresting officers reasonably believed that someone else inside the house might pose a danger to them, as those facts reflected only the dangerousness of the arrested individual, not others." (internal quotation marks and alteration omitted)); *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) ("If district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep."). As for the "severity of the situation," the record suggests that the situation was anything but. The area was secured by at least eight officers. When Reed knocked on Dozier's front door, she answered, exited, and told the officers that Coney was inside. When Reed told Coney to come out, he too complied, and told the officers that two others were inside. And when Skomski called Allen and Wheeler to come down, they did. All of this occurred calmly and without resistance from Dozier, Coney, Allen, or Smith. The situation was simply not severe.

Of course, it is still Coney's burden to establish that the officers' decision to enter his residence was unreasonable in view of clearly established law. *See Webb*, 2015 WL 3756919, at *8. While Coney cites no such law, Defendants do. (Defs.' Reply at 5 (citing *United States v. Colbert*, 76 F.3d 773 (6th Cir. 1996)).)

In *Colbert*, federal agents were investigating Lorenzo Colbert for homicide. Colbert had been staying with his girlfriend, Andrea Lewis, and so officers decided to monitor her apartment. 76 F.3d at 775. After about three hours of surveillance, Colbert exited the apartment and walked toward his car. *Id.* The officers arrested him there. *Id.* Lewis then came out of her home in a "hostile rage" leading the police to detain her. *Id.* An agent then "immediately went to the front

door of the apartment" concerned that someone might be inside. *Id.* "The apartment's entrance was barred by a closed screen door, which [the agent] opened and yelled into the apartment, 'Police!' He received no answer, but testified that he saw a shotgun leaning against a wall in plain view. . . . [The agent] then conducted a protective sweep of the apartment and observed a revolver and scales in plain view." *Id.*

Colbert argued that the sweep was unconstitutional. The Sixth Circuit agreed. Although it extended *Buie*'s protective-sweep-exception to arrests outside the home, it stressed that in all cases officers must "have a reasonable articulable suspicion that a protective sweep [was] necessary by reason of a safety threat." *See id.* at 777. The only fact even arguably giving the officers such suspicion was Lewis' somewhat hysterical state. But, said the Court of Appeals, that was not a reasonable basis for entering the home as it was "altogether incredible that an officer would be surprised by the fact that a resident of a home would come out of his or her house upon seeing a large group of undercover police officers arresting an individual who just left that resident's apartment." *Id.* at 777. Moreover, one of the arresting officers testified that he "didn't have any information at all" as to whether anyone else was inside the house. *Id.* at 777–78. On these facts, the Sixth Circuit clearly held,

> Lack of information cannot provide an articulable basis upon which to justify a protective sweep. . . . [A]llowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep. Finally, and perhaps most importantly, allowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit command in *Buie* that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home.

*Colbert*, 76 F.3d at 778. The Court stressed: "'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Id.*

28

On the record before the Court, *Colbert* provided more than fair warning to Skomski, Pasternacki, McKibben, Huffman, and Siegfried that they could not conduct a protective sweep of Coney's residence. The summary-judgment record is entirely devoid of anything indicating that someone dangerous lurked inside. And every reasonable officer in Skomski, Pasternacki, McKibben, Huffman, and Siegfried's position would have known that sweeping Coney's dwelling without "an articulable basis on which to support their reasonable suspicion of danger from inside the home," *Colbert*, 76 F.3d at 778, was unlawful.

Thus, Skomski, Pasternacki, McKibben, Huffman, and Siegfried are not entitled to summary judgment on Coney's unconstitutional search claim. (Compl. ¶ 55.)

**5.**

In Count I of his Complaint, Coney also says that the City of Warren officers unlawfully searched his cell phone following his arrest. Coney does not dispute that, prior to the Supreme Court's decision in *Riley v. California*, — U.S. —, 134 S. Ct. 2473, 2494, 189 L. Ed. 2d 430 (2014), whether officers could search a cell phone incident to a lawful arrest was not clearly established. (*See* Pl.'s Resp. at 21). *See also United States v. Sanford*, No. 12-20372, 2013 WL 2300820, at *1 (E.D. Mich. May 24, 2013) ("[C]ourts disagree as to whether police may search the contents of a cell phone incident to an arrest."). Instead, he asserts that his arrest was not lawful. (Pl.'s Resp. at 21.) But the Court has already concluded that a reasonable officer in Reed and Skomski's position could have thought there was probable cause to arrest Coney. And if a reasonable officer could think he had lawfully arrested Coney, that officer, given the unsettled state of the law prior to *Riley*, could also think that he could lawfully search Coney's phone. Thus, all of the City of Warren officers named in this case are qualifiedly immune for the search of Coney's cell phone.

* * *

To summarize the Court's findings as to Count I, Skomski, Pasternacki, McKibben, Huffman, and Siegfried are not entitled to summary judgment on Coney's claim that they violated his Fourth Amendment rights by searching his residence without a warrant. (*See* Compl. ¶ 55.) As to all other aspects of Count I, Reed, Skomski, Nearing, Pasternacki, McKibben, Huffman, and Siegfried are entitled to summary judgment.

## C.

In Count II, Coney pleads a *Monell* claim: he says that the City of Warren is liable under 42 U.S.C. § 1983 for maintaining a policy, custom, or practice that led to his unlawful arrest and detention. (Compl. ¶¶ 59–60.) *See also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* Relying on *Thomas*, Coney says, "Plaintiff may establish municipal liability by showing a policy of inadequate training or supervision, including a policy of tolerating federal rights violations that is unwritten, but nevertheless entrenched." (Pl.'s Resp. at 24.) Coney has not successfully traversed either avenue.

To succeed on an inadequate training claim, "a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually

30

caused the plaintiff's injury." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). Coney has not produced evidence permitting a reasonable jury to find that the City of Warren has inadequately trained its officers on how to determine probable cause or handle exculpatory evidence. Coney relies heavily on the training logs for each of the ten officer-defendants. (*See* Pl.'s Resp. at 25.) He says that "[t]he only items [in the logs] that even remotely resemble trainings on warrantless arrests, probable cause, or how to conduct an investigation are a Field Investigations class that Petruzzini took in 2001 and a Patrol Response class taken by [Skomski] and Pasternacki in 2009." (Pl.'s Resp. at 25.) But Coney overlooks Reed's testimony that when officers first come on board they complete a "17-week police academy." (Reed Dep. at 7.) A jury would be hard pressed to conclude that this training did not cover at least the basics of the probable cause standard and how to determine when it is met.

Indeed, each officer's testimony reflects that he understood the relevant probable-cause considerations. Reed said, "You respond to the scene as quickly and as safely as possible and begin to assess the situation, once you arrive on the scene. Speak to the [911] caller and speak to anybody else who may have witnessed the incident. . . . Determine if a crime has occurred. If so, you take appropriate action." (Reed Dep. at 10–11.) When Skomski was asked, "How do you make sure a crime was committed?," he answered, "By talking to the victims, witnesses, and looking at evidence." (Skomski Dep. at 8.) And Nearing stated that when he conducts an investigation he considers the "evidence," "[h]ow the police were contacted or came in contact with those involved, and statements made by witnesses or suspects or officers based on that contact." (Nearing Dep. at 14.) Given the highly fact-specific nature of probable-cause determinations, Coney has not shown that the officers' knowledge of these general guidelines was inadequate.

And even assuming otherwise, Coney has not produced evidence permitting a jury to find that the City's inadequate training on probable cause for arrest was due to deliberate indifference. *See Cherrington*, 344 F.3d at 646. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (internal quotation marks and citation omitted); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy *so likely* to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." (emphases added)). Coney points out that Reed testified that about ninety percent of his arrests are without a warrant. (Pl.'s Resp. at 26; Reed Dep. at 15; *see also* Skomski Dep. at 10 (testifying that in 12 years he had not obtained an arrest warrant).) While this shows that the City should have known that its officers were constantly making on-the-spot probable-cause determinations, it does not show that these determinations were erroneous or that the City had reason to think that the officers were likely to err in those determinations. Other than his own arguably unlawful arrest, Coney has identified no cases of erroneous probable-cause determinations by City of Warren police officers.

This last point also closes the other avenue Coney pursues: that the City of Warren is liable because it does nothing about repeat civil rights violations. To succeed on an "'inaction theory,' where a policy of tolerating federal rights violations is unwritten but nevertheless

32

entrenched," Coney must show, among other things, "the existence of a clear and persistent pattern of [illegal activity]." *Thomas*, 398 F.3d at 429. Coney has no such evidence.

The City of Warren is entitled to summary judgment on Count II of Coney's Complaint.

## D.

In Count III of his Complaint, Coney has pled claims under Michigan law: false arrest and false imprisonment. (Compl. ¶¶ 63–64.) Michigan grants police officers, like Defendants, governmental immunity for when they make discretionary decisions in good faith. *See Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). This is similar to the qualified-immunity standard applicable under federal law, but there are differences.

One favors Coney. As noted, once adequately raised, it becomes the § 1983 plaintiff's burden to defeat qualified immunity. But Michigan places the burden of proving the affirmative defense of governmental immunity on officers. *Odom*, 760 N.W.2d at 228. And, on summary judgment, this difference is amplified: instead of having the burden of pointing out that Coney lacks evidence upon which a jury could find for him, Defendants have the burden of producing evidence "so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012).

Nonetheless, a second difference dispositively favors the City of Warren police officers. Michigan's governmental immunity does not merely shield officers from damages resulting from their objectively reasonable decisions, but shields them from their *subjectively* reasonable decisions. *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015). In other words, governmental immunity "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Odom*, 760 N.W.2d at 229.

33

Here, even if Reed and Skomski should have investigated further before arresting Coney, and even if Nearing should have released Coney at the start of his investigation, every reasonable jury would find that the officers did not arrest or detain Coney to injure him (or that they were so indifferent to whether harm would result to Coney that they effectively intended to harm him). *See Odom*, 760 N.W.2d at 225; *see also id.* (noting that lack of good faith has been described as "malicious intent, capricious action or corrupt conduct" and "willful and corrupt misconduct"). Reed testified that he believed that Coney had shot at Collier and that he believed he had probable cause to arrest Coney. (*See* Reed Dep. at 29 ("We didn't have any reason to not believe what [Collier] was saying."); *see also id.* Reed Dep. at 20, 23, 34.) Skomski believed the same. (Skomski Dep. at 29–31.) Nearing testified that when Coney told him that he was not the shooter, he attempted to "confirm whose side of the story was the truth" and that it was not until after he interviewed Collier that he was convinced that Coney was not the shooter. (Nearing Dep. at 41, 43; Counter Stmt. of Material Facts ¶ 6.) The record thus conclusively demonstrates that, while perhaps negligent, none of the three officers acted with malice toward Coney.

Reed, Skomski, and Nearing are governmentally immune from Coney's claims of false arrest and false imprisonment.

## IV.

Should the officers who responded to Collier's 911 call have engaged in more investigation before arresting Coney? In hindsight, the answer is "yes." But the question presented is whether a reasonable officer, knowing the clearly established law and what Reed, Skomski, and Nearing knew when they acted, could have thought there was probable cause for Coney's arrest and detainment. The answer is also "yes." So the Court will largely grant Defendants' motion for summary judgment. (Dkt. 25.) In particular, Defendants' motion is

34

GRANTED except for Coney's claim that officers Skomski, Pasternacki, McKibben, Huffman, and Siegfried violated his Fourth Amendment right to be free from unreasonable searches when they entered his residence without a warrant.

      SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  July 16, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

35